IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES LOMAX, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 25-CV-4496 |
| | : | |
| MS. MONIQUE SAVAGE, *et al.*, | : | |
|     Defendants. | : | |

**MEMORANDUM**

**MURPHY, J.**                                                                                    **April 21, 2026**

Plaintiff James Lomax, a prisoner incarcerated at SCI Phoenix, filed this civil rights

action pursuant to 42 U.S.C. § 1983, claiming that the Defendants—Wellpath (the prison's

medical provider), Dr. Anthony Letizio, R.N. Monique Savage, and Physical Therapist Jack

Waters—were deliberately indifferent to his serious medical needs in violation of the Eighth

Amendment by preventing him from receiving knee replacement surgery.[1]  Defendants

Wellpath, Dr. Letizio, and Nurse Savage have moved to dismiss the claims against them.  For the

following reasons, the Court will dismiss certain of Lomax's claims while permitting other

claims to proceed.

---

[1] The Court dismissed certain of Lomax's claims upon screening pursuant to 28 U.S.C. § 1915A(b), specifically, all claims against the Commonwealth, damages claims against any Commonwealth Defendants in their official capacity, and claims against the "John/Jane Doe defendants" who were not alleged to have been personally involved in the relevant events and were essentially placeholders.  (ECF No. 5.)  Although Lomax was not entitled to service under 28 U.S.C. § 1915(d) and Federal Rule of Civil Procedure 4(c)(3) because he is not proceeding *in forma pauperis*, (*see* ECF No. 4), the Court nevertheless directed service on his behalf in light of his "incarcerated status and his claimed need for medical care," (ECF No 8 at 1 n.1; *see also* ECF No. 5).  As a result of these efforts, Defendants Wellpath, Dr. Letizio, and Nurse Savage were all served or waived service.  (ECF Nos. 7 & 26.)  Defendant Jack Waters remains unserved.  (*See* ECF No. 29.)

I.      FACTUAL ALLEGATIONS

Lomax alleges that the Defendants have prevented him from receiving doctor-recommended knee replacement surgery by requiring him to use scheduling procedures intended to save costs and delay care, and, separately, by misrepresenting his medical record.  In 2020, an orthopedic specialist "prescribed and recommended" that Lomax receive "total right knee replacement surgery."  DI 1. at 4, 7.  The surgery was initially delayed because of the COVID-19 pandemic.  *Id.* at 7.  It was further delayed because Lomax was "involved in a legal matter."  *Id.* Once that matter resolved, Lomax reached out to a prison administrator to be scheduled for surgery and was told he would need to sign up for "sick call" to do so.  *Id.* at 4, 7.  The timing on this point is somewhat unclear, but an exhibit attached to the Complaint indicates that Lomax requested the knee replacement surgery in January 2022, and was directed to the "sick call" system in April 2022.  *Id*. at 19.  The Complaint also reflects that Lomax received an ultrasound on May 27, 2022, the results of which suggested "right knee joint effusion."  *Id.* at 13, 23.  The Complaint may be reasonably read to allege that Lomax was a candidate for knee surgery as of January 2020, and that after some delay not attributable to the Defendants, he initiated the requests for care at issue in this case as his condition worsened.

Dr. Letizio, then Wellpath's Onsite Medical Director, was responsible for overseeing all treatment recommended and/or provided for prisoners, and also oversaw the sick call process, which governed access to onsite medical care at the prison.  *Id.* at 4, 5.  Although Lomax complied with the relevant procedures, he did not receive knee replacement surgery.  Rather, he contends to have encountered a "custom" of Wellpath and the medical department designed to "delay and deny" costly care needed by prisoners such as himself by requiring them to "sign up for sick call to ask to be placed on 'Doctor Line' so a doctor can make a referral for the

2

specialized treatment that is needed." *Id*.; *see also id.* at 5-6.  According to Lomax, a doctor cannot schedule a prisoner for prescribed procedures with a specialist unless a referral is first made through Doctor Line, but the Doctor Line is staffed by nurses and physician's assistants who often refuse to make referrals because they are "unqualified and not trained in recognizing a serious injury or medical condition." *Id.* at 4.  He alleges that the process of requiring prisoners such as himself to "return to sick call[] to get a referral to see a doctor causes a lot of unnecessary pain and suffering, [because] while awaiting the scheduling of a doctor line, and seeing a doctor to make a referral for a specialist to treat and/or examine the [already reported injury or condition] . . . the reported medical problem . . . worsen[s]." *Id.* at 5-6.  He claims that as a result of the delay attributable to this cost-saving "custom," he used his left knee to compensate for his untreated right knee, such that both knees now require treatment.  *Id* at 6.  Lomax filed requests and grievances while awaiting care but was not scheduled for surgery.  *Id.* at 11 (alleging that Lomax "keeps asking sick call to put him on doctor line so he [can] be referred to an orthopedic specialist to be scheduled for treatment and the total right knee replacement surgery and that request has been denied for months, as he remains in unnecessary pain[ and] suffering"); *see also id.* at 4, 18-23.

In June 2023, Lomax had an appointment with non-Defendant Dr. Bazel.  Dr. Bazel examined Lomax and recommended that he receive an MRI, *id.* at 5, "to determine the additional damage to both knees" given the delay in care, *id.* at 8, and because the orthopedic specialist "likes to have an MRI done" for a proper understanding of Lomax's alignment, *id.* at 5.  Dr. Bazel requested the MRI on June 7, 2023, *id.* at 11, but Dr. Letizio denied the request "for nonmedical reasons without physically examining [Lomax] and his right knee condition," *id.* at

5; *see also id.* at 4, 11.   Dr. Letizio allegedly told Dr. Bazel to inform Lomax that he "would have to sue [Letizio] to get the needed treatment." *Id.* at 4, 11.

On June 21, 2023, Dr. Letizio instructed Lomax to exercise for six months in lieu of providing the MRI or other care. *Id.* On the same date, Lomax filed Grievance # 1039593, in which he alleged that Dr. Letizio was denying appropriate care for his right knee. *Id.* at 11, 24. Defendant Nurse Savage reviewed the grievance.  Her notes describe Lomax as having a history of "nearly decade long Knee complications." *Id.* They also reflect that, as of June 15, 2023, Lomax was "awaiting approval for [an] outside consult as requested [the prior week] by Dr. Bazel," and that follow up was needed. *Id.* According to Savage's response, Lomax—then suffering from "chronic legs edema"—saw Dr. Bazel at sick call on June 21, 2023, and asked about the MRI and specialist consult. *Id.* He was informed he was "not authorized" for an MRI or consult, and "told to exercise and self PT for 6 months." *Id.* at 25.  Savage's response also reflects that Dr. Bazel ordered nylon socks for Lomax and that he received new knee braces on July 14, 2023, following a sick call visit a week earlier. *Id.* At the sick call visit, he was described as having a "slow" and "moderately antalgic gait" and "+2 edema bilateral knees." *Id.*

Following this recitation of Lomax's medical history and care, Savage upheld the grievance in part—though saying nothing about the request for surgery—noting that "[s]pecific long term treatment care plan and/or assistive device(s) for knee instability needed." *Id.* However, she also denied the grievance in part "[d]ue to decreased compliance with HEP program from Physical Therapist Mr. Water." *Id.* at 25; *see also id.* at 5 (alleging that Savage denied the grievance "because [Lomax] did not comply with Physical Therapist Jack Waters' Orders to do in-cell exercises").  Lomax says he was compliant with physical therapy and believes Waters "falsified" his medical record to deprive him care. *Id.* at 5, 12.  However, when

4

he asked Waters about the misrepresentation in the grievance response, Waters stated he "did not tell . . . Ms. Savage that," and explained that he had "wanted [Lomax] to do exercises after the surgery so [he] could recover better." *Id.* at 5 (second alteration in original).

In any event, Lomax alleges that Savage's misrepresentation "falsif[ied] his medical records" and was "an absurdity" because neither Savage nor Waters witnessed him in his cell. *Id.* at 5. Savage's "disinformation placed in [his] medical records" further prevented him from obtaining knee replacement surgery for his right knee. *Id.* As a result of the delay in receiving surgery, Lomax's "left knee is swollen more than his right knee – from his left knee overcompensating [for] his right knee – with excessive pain." *Id.* Lomax appealed the denial of Grievance # 1039593, and on August 24, 2023, filed a grievance about both knees. *Id.* at 12; *see also id.* at 27-32.

In this civil action, Lomax brings claims against Wellpath, Dr. Letizio, Nurse Savage, and Physical Therapist Jack Waters for deliberate indifferent to his serious medical needs in violation of the Eighth Amendment based on the delay in and continued denial of knee replacement surgery.[2] He alleges that despite the five year period of "returning to sick call, as instructed, exercising as instructed, and requesting to be scheduled for the total right knee replacement surgery as instructed by CHCA Huner," he has not received knee surgery, an MRI,

---

[2] Although Lomax also appears to invoke the Due Process Clause as a basis for his claims, DI 1 at 9, the "more-specific-provision rule" requires litigants to pursue constitutional claims under the specific provision that covers the conduct at issue, rather than resorting to the more general Due Process Clause, so Lomax must proceed under the Eighth Amendment, *see Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 261 (3d Cir. 2010) ("Betts's claims concern his conditions of confinement and an alleged failure by Defendants to ensure his safety. Because these allegations fit squarely within the Eighth Amendment's prohibition on cruel and unusual punishment, we hold that the more-specific-provision rule forecloses Betts's substantive due process claims." (footnote omitted)). In other words, there is no legal basis for a due process claim here.

or any "medical treatment to treat the swelling in both knees, the pain in both knees, [and] the chronic legs edema." *Id.* at 13.  He seeks damages and "an injunction requiring immediate, adequate and proper treatment" of his knees.[3]  *Id.* at 8.

## II.    STANDARD OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citing *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 871 (3d Cir. 1992)).  In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).

We "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon

---

[3] To the extent Lomax seeks a "declaratory judgment that Defendants breached the Eighth Amendment" based on their prior conduct, DI 1. at 8, his request is improper, *see Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*) ("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant simply to proclaim that one party is liable to another.").

these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). To determine whether a complaint filed by a *pro* se litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether that complaint, liberally construed contains facts sufficient to state a plausible . . . claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally). It is the defendants' burden to show that a complaint fails to state a claim. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented"). Further, the Prison Litigation Reform Act ("PLRA") requires the Court, whether on its own or pursuant to a motion, to "dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1997e(c)(1).

## III.    DISCUSSION

### A.  Deliberate Indifference to Serious Medical Needs

Wellpath, Dr. Letizio, and Nurse Savage all move to dismiss the Complaint for failure to state plausible Eighth Amendment claims against them. To state an Eighth Amendment claim based on the failure to provide medical treatment, a prisoner must allege facts reflecting that prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994). "A medical need is serious. . . if it is one that has been

7

diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."[4] *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (quotations and citations omitted). "A serious medical need [also] exists where 'failure to treat can be expected to lead to substantial and unnecessary suffering.'" *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991)).

A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Deliberate indifference can be inferred from circumstantial evidence, and is properly alleged "where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, [or] (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Montanez v. Price*, 154 F.4th 127, 141 (3d Cir. 2025) (quoting *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017)), *petition for cert. filed*, 94 U.S.L.W. 3289 (U.S. Mar. 11, 2026) (No. 25-1073). In contrast, allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of

---

[4] Lomax's knee conditions, which were diagnosed by physicians, meet this criteria. *See McGinnis v. Hammer*, 751 F. App'x 287, 290 (3d Cir. 2018) (*per curiam*) (concluding that inmate with knee issues had alleged a serious medical need). The Defendants do not argue otherwise.

prisoners." *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993) (citations omitted).  "Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (citing *Durmer*, 991 F.2d at 67).  Inadequate care may nevertheless give rise to a deliberate indifference claim when a defendant "act[s] with the requisite state of mind when providing that inadequate care." *Pearson*, 850 F.3d at 535; *see also Palakovic*, 854 F.3d at 228 ("[P]rison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition" (quotations and citations omitted)).  This standard is met when a delay or denial of medically necessary care is intended to inflict pain without medical justification or is based solely on a nonmedical reason, such as cost, without any effort to mitigate harm.  *DiFraia v. Ransom*, --- F.4th ---, No. 24-2673, 2026 WL 878627, at *4 (3d Cir. Mar. 31, 2026).

Prison contractors may be liable for constitutional violations brought pursuant to § 1983 only if their policies or customs caused the alleged constitutional violation.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003).  "Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)).  "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).  "A plaintiff must also allege that the

9

policy or custom was the 'proximate cause' of his injuries." *Id*. (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).

### 1. *Wellpath and Dr. Letizio*

Wellpath and Dr. Letizio argue that Lomax failed to state a deliberate indifference claim against them because it is apparent that he received medical care and "simply disagrees with Defendant's protocol." DI 28at 13-14. They also argue that Lomax did not allege any facts to suggest that the denial of care was intentional. *Id.* These arguments mischaracterize Lomax's Complaint.

Lomax alleges that he was a candidate for right knee replacement surgery as early as January 2020, and that when he sought to proceed with the surgery following the pandemic and unrelated litigation, he was unable to obtain the recommended care because of the delays caused by Doctor Line, and Dr. Letizio's specific denials of care in his case, which overruled recommendations made by treating physicians. Taking Lomax's liberally construed allegations as true, he was required by Wellpath custom to use Doctor Line for scheduling when he sought to obtain doctor-recommended knee replacement surgery for his right knee in early 2022. According to Lomax, directing inmates through this process was intended to delay access to costly, necessary care. *See* DI 21 at 7 (claiming that the "Doctor Line" procedure was intended to reduce cost by reducing the number of "off-site trips" for medical care). The Complaint supports an inference that this custom in fact delayed Lomax's access to care, since nothing in the record suggests that Lomax has ever been scheduled for surgery or a visit with an orthopedic specialist. Lomax's knees have worsened in the meantime, causing pain and deterioration of his left knee, which he used to compensate for the right knee. At this stage of the litigation, Lomax has alleged a sufficient basis for a claim against Wellpath. *See Weaver v. Wellpath, LLC*, No.

10

23-0258, 2024 WL 3584579, at *2, 7 (W.D. Pa. July 30, 2024) (concluding that plaintiff stated a claim to relief based on allegation that Wellpath's "collegial review" policy delayed necessary medical treatment); *Rudolph v. Wellpath*, No. 22-0382, 2023 WL 2563083, at *8-10 (M.D. Pa. Mar. 17, 2023) (same).

Turning to the claim against Dr. Letizio, the Complaint and attached exhibits reflect that, after examining Lomax, Dr. Bazel ordered a consult and an MRI on both knees, which were denied by Dr. Letizio.  At that time, Dr. Letizio told Dr. Bazel that Lomax would have to "sue him to get the needed treatment," DI 1. at 4, and instead ordered Lomax to exercise for six months without having examined him.  This statement, taken in context with Lomax's other allegations, support an inference that Dr. Letizio denied medically indicated care for Lomax while "acting with the requisite state of mind." *Palakovic*, 854 F.3d at 228; *see also Mallet v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 137 (2d Cir. 2025) (concluding that, where officers and nurses told plaintiff that "he would only get the minimum treatment the State will allow at the behest of Dr. Makram,"  it was "certainly plausible that Dr. Makram consciously chose an easier and less efficacious treatment plan for Mallet's symptoms—a standard theory of Eighth Amendment deliberate indifference" (citation modified)).  While a doctor's exercise of medical judgment in providing care precludes a finding of deliberate indifference, these allegations, read in the light most favorable to Lomax suggest that Dr. Letizio was not exercising medical judgment when he denied care in Lomax's case.  *See Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (explaining that, while courts will "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment[,] which remains a question of sound professional judgment[, i]mplicit in this deference to prison medical authorities is the assumption that such an informed judgment has, in

11

fact, been made" (citation modified)); *Merritt v. Fogel*, 349 F. App'x 742, 746 (3d Cir. 2009)

(*per curiam*) (vacating dismissal of complaint despite Magistrate Judge's observation that

"defendants have repeatedly monitored and tested [plaintiff] and have determined that he does

not qualify for HCV treatment" when other allegations reflected defendants falsely represented

that plaintiff was never within the protocol for treatment despite prior recommendation from

specialists and made comments arguably suggestive of deliberate indifference); *Sparks v.*

*Rittenhouse*, 164 F. App'x 712, 719 (10th Cir. 2006) (vacating the dismissal of deliberate

indifference claim where "[t]he gist of [plaintiff's] contention, as it developed over time, is that

Ms. Rittenhouse was the gatekeeper both to the orthopedic specialist and the insurance company,

and her deliberate failure to fulfill that role was the cause of the delay in his receiving surgery").

In sum, Wellpath and Dr. Letizio have not met their burden for obtaining dismissal on the

merits.[5]

---

[5] Wellpath and Dr. Letizio also argue that Lomax's claim is barred by the applicable two-year statute of limitations because he knew he required surgery in January 2020 but did not file his Complaint until August 2025. DI 28 at 14. Dismissal of a complaint based on the statute of limitations is only appropriate at the pleading stage when the "defense is apparent on the face of the complaint." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017) (citing *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014)). The Defendants' two-sentence argument does not meaningfully address the crux of Lomax's claim, *i.e.*, that when he sought knee replacement surgery after some initial delay unrelated to his claim, he was funneled through the Doctor Line system to delay access to care and was then denied a doctor-ordered MRI by Dr. Letizio, who instructed Lomax to exercise instead, and stated that he "would have to sue . . . to get the needed treatment." DI 1at 4. Defendants' Motion ignores these facts, as well as Lomax's allegation still has not received surgery because of the Defendants' actions. *See Weaver*, 2024 WL 3584579, at *5-6 (explaining the impact of the continuing violations doctrine on medical delay claims at the pleading stage). The Defendants have also failed to consider how the statute of limitations was tolled while Lomax exhausted his administrative remedies. *See Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 603 (3d Cir. 2015) ("[T]he PLRA is a statutory prohibition that tolls Pennsylvania's statute of limitations while a prisoner exhausts administrative remedies."). Accordingly, they have fallen far short of carrying their burden for obtaining dismissal based on this affirmative defense. *See Weaver*, 2024 WL 3584579, at *6 ("Weaver alleges repeated efforts to secure treatment through prison processes followed by a continuum of arguable stonewalling and delay. Based on these allegations, it cannot be said as a matter of law that his

### 2. Savage

Savage argues that Lomax has failed to state a deliberate indifference claim against her based on her response to Grievance Number 1039593, because it is apparent from her response that Lomax was receiving some care and Savage "could defer to the medical provider's professional judgment." DI 14 at 7-8. Lomax responds that Savage's "false entries in the medical record and grievance process continue to be the moving force behind [his] diagnosed knee conditions not being treated." DI 21 at 11.

Indeed, Lomax's claim against Savage is based on his assertion that she falsely represented he was noncompliant with physical therapy, and that this misrepresentation prevented him, and continues to prevent him, from receiving care he required for his knees. DI 1 at 11-13. Savage does not meaningfully engage with this allegation in her Motion; like Wellpath and Dr. Letizio, she argues for dismissal on the basis that Lomax "received treatment." DI 14 at 7. It is not clear what caused the alleged misrepresentation in the grievance response. However, at this early stage of the litigation, the misrepresentation coupled with Lomax's contention that Savage's rejection of his grievance further delayed his care is sufficient to raise an inference of deliberate indifference. *See Montanez*, 154 F.4th at 143-44 (holding that, where healthcare administrator allegedly lied about the results of plaintiff's x-ray by "misinforming [his] doctors that the results were negative and thus preventing [him] from receiving timely treatment," plaintiff's allegations, "taken as true, [were] sufficient to show that [the administrator] had actual knowledge . . . that prison doctors or their assistants [were] mistreating (or not treating)

---

claims are based on any discrete acts rather than continuing deliberate indifference."). Further, to the extent Wellpath and Letizio argue for dismissal of any medical malpractice claims due to Lomax's failure to file a certificate of merit, DI 28 at 14-16, their argument is foreclosed by recent precedent, *Berk v. Choy*, 146 S. Ct. 546, 551 (2006); *DiFraia*, 2026 WL 878627, at *7.

13

[plaintiff's] serious medical need" (internal quotation marks and citations omitted)); *Green v. Branson*, 108 F.3d 1296, 1304 (10th Cir. 1997) (observing that the denial of care "coupled with falsification of medical records" may support a deliberate indifference claim (citation omitted)); *Hayes v. Toole*, No. 16-20, 2017 WL 898000, at *2 (S.D. Ga. Mar. 7, 2017) ("Plaintiff contends that Defendants Tool and Sabine denied his grievances because the medical care he requests is expensive, and that Defendant Williams denied his grievance by falsely stating that Plaintiff refused to be seen at sick call.  These facts, which the Court must accept as true at this stage, demonstrate that Defendants' reasoning for denying Plaintiff's grievances exhibited deliberate indifference to his serious medical needs." (cleaned up)); *see also Johnson v. Lewis*, 83 F.4th 1319, 1329 (11th Cir. 2023) ("But after months without treatment, Johnson submitted a grievance complaint detailing his condition and lack of treatment. The denial of Johnson's grievance bears Dr. Lewis's signature—a fact from which a jury could reasonably infer that she had knowledge of the contents of the form.").

### 3. Waters

Although Waters has not moved to dismiss because he has not yet been served, the Court independently concludes that Lomax has not alleged a plausible basis for a deliberate indifference claim against him.[6]  Lomax's claim against Waters derives from the allegedly false statement reflected in Savage's response to his grievance, *i.e.*, that Lomax did not comply with

---

[6] Lomax notes that Waters has not been served and seeks to serve him.  As noted, *see supra* n.1, Lomax is not entitled to service by the Marshal as of right because he is not proceeding *in forma pauperis*. *See Daker v. Ward*, No. 23-10609, 2023 WL 7182358, at *4 (11th Cir. Nov. 1, 2023) (noting distinction between legal requirements for service when an incarcerated plaintiff is proceeding *in forma pauperis* on the one hand and paid cases on the other hand).  Since the Court concludes that Lomax has not alleged a plausible basis for a claim against Waters, it will dismiss the claim against Waters rather than issuing a summons to Lomax so he can proceed with service.

14

Waters's instruction to exercise in his cell. DI 1 at 12. However, Lomax's Complaint also describes a discussion with Waters during which Waters explained he had not told Savage that Lomax was noncompliant, and that he had simply "wanted [Lomax] to do exercises after the surgery so [he] could recover better." *Id.* at 5 (second alteration in original). Lomax repeats and clarifies this allegation in his response to Savage's Motion and provides a record of his conversation with Waters, which occurred on September 19, 2023, (DI 21 at 4, 18,[7] approximately two months after Savage denied the grievance, DI 1 at 26. The relevant record reflects Waters's notes that Lomax was concerned he was "denied further testing" based on a perception that he was non-compliant, and that the "PT notes" did not reflect non-compliance but instead "state[d] that PT/IM have discussed need to be compliant to maximize pre/Post surgical benefits." DI 1 21 at 5, 18. Waters also noted that Lomax "actually seeks advice on MORE TE's that would be beneficial to Knee ROM and Strength" and that he "has been compliant and cooperative with his Plan of care." *Id.* The note ends with Waters's observation that Lomax "continues need for further medical testing and consultation secondary to advancing." *Id.*

These facts do not support an inference that Waters was deliberately indifferent to Lomax's medical needs or that he was even responsible for any misrepresentations that may have been included in the response to Lomax's grievance. Even if Waters was somehow responsible

---

[7] When evaluating a motion to dismiss, a court may look to "allegations contained in the other court filings of a pro se plaintiff" to clarify statements made in the complaint. *Swofford v. Mandrell*, 969 F.2d 547, 549 (7th Cir. 1992) (citations omitted); *see also Am. W. Bank Members v. Utah*, No. 23-4091, 2024 WL 3812451, at *9 (10th Cir. Aug. 14, 2024), *cert. denied sub nom.*, 145 S. Ct. 2796 (2025) (explaining that a plaintiff's brief may be used "to clarify allegations in her complaint whose meaning is unclear" but not for purposes of providing allegations that "are not unclear but absent" (cleaned up)); *Maio v. Aetna, Inc.*, 221 F.3d 472, 485 n.12 (3d Cir. 2000) ("[W]hile this case involves a motion to dismiss under Rule 12(b)(6), the Supreme Court . . . confirmed that we may use appellants' brief 'to clarify allegations in the complaint whose meaning is unclear.'" (quoting *Pegram v. Herdrich*, 530 U.S. 211, 230 n.10 (2000))).

for a misunderstanding as to Lomax's compliance with physical therapy, Lomax's own allegations reflect that, following a discussion, Waters corrected the record on that point and clarified his notes. In sum, Lomax has not alleged a plausible basis for a deliberate indifference claim against Waters, so the Court will dismiss this claim pursuant to § 1997e(c). *See Beenick v. LeFebvre*, 684 F. App'x 200, 204 (3d Cir. 2017) (explaining that "§ 1997e(c) is applicable throughout the litigation and provided the District Court with the authority to review the claim, regardless of the stage of the case" (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109, n.11 (3d Cir. 2002)); *Dorman v. Harris*, No. 18-1045, 2023 WL 1765551, at *4 n.5 (D. Del. Feb. 3, 2023) (explaining that a "record-keeping mistake . . . falls well short of what is necessary to establish a deliberate indifference claim" (citing *Spruill*, 372 F.3d at 235)).

## B. Wellpath Bankruptcy

Apart from the merits, Wellpath argues that since Lomax challenges conduct pre-dating Wellpath's filing for bankruptcy on November 11, 2024, his claims against it are discharged pursuant to a Chapter 11 Plan of reorganization confirmed by the Bankruptcy Court (the "Plan").[8] DI 28 at 1. Dr. Letizio, as a former Wellpath Employee, argues that claims against him are released by the Third Party Release incorporated into the Plan because Lomax did not timely opt out of the Release.[9] *Id.* at 2. Lomax did not address these arguments. *See* DI 34.

Indeed, Wellpath was discharged from liability by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), for claims that

---

[8] Wellpath and Dr. Letizio state that this case was stayed in light of the bankruptcy, (ECF No. 28 at 2), but that is not so. This case was filed after the plan became effective and was never subject to a stay.

[9] It is the Court's understanding that Dr. Letizio is no longer employed by Wellpath. (*See* DI 21 at 11 (describing Dr. Letizio as the "former Well Path on-site director").)

arose prior to November 11, 2024.[10]  *See In Re Wellpath Holdings, Inc.*, No. 24-90533 (Bankr. S.D. Tx.), ECF Nos. 2596, 2679, 2680; *see also* 11 U.S.C. § 524(a)(2) ("A discharge in a [Chapter 11 bankruptcy] case . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived."). As part of Wellpath's Chapter 11 Reorganization Plan (the "Plan"), a Liquidating Trust has assumed Wellpath's liability "for all General Unsecured Claims," including personal injury and wrongful death claims—such as those pursued by Lomax—covered by the discharge injunction.  *See* Order Confirming Ch. 11 Plan, *In re Wellpath Holdings*, No. 24-90533 (Bankr. S.D. Tex. May 1, 2025), ECF No. 2596 at 107 (Assumption of General Unsecured Claims by the Liquidating Trust).  To be eligible for compensation from the Liquidating Trust, a claimant must "have timely filed, or have been deemed to have timely filed, or have obtained appropriate leave from the Bankruptcy Court to file late, a Proof of Claim with the Bankruptcy Court" that is signed under penalty of perjury.[11]  *See* Trust Distribution Procedures, *In re Wellpath Holdings*, ECF No. 2679 at 351; *see also Howard v. Wellpath, LLC*, No. 23- 5140, 2026 WL 881708, at *7 n.12 (E.D. Pa. Mar. 31, 2026) ("Howard should note that he may not be able to recover any damages from the Liquidating Trust unless he has filed a proof of claim.").  Lomax does not

---

[10] The Court may take judicial notice of the bankruptcy proceedings.  *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416 n.3 (3d Cir. 1988).

[11] Personal injury claimants who have filed proof of their claim in accordance with the Plan may proceed with non-binding alternative dispute resolution as envisioned by the Trust Distribution Procedures.  *See* Trust Distribution Procedures, *In re Wellpath Holdings*, ECF No. 2679. Alternatively, they may proceed with unsecured claims "in the appropriate civil court and litigate such claim with the Trust included as a nominal defendant."  Revised and Amended Clarifying Order, *In re Wellpath SF Holdco*, No. 24-90566 (Bankr. S.D. Tx. Jan. 25, 2026) (cleaned up); *see Thomas v. Clark County*, No. 22-00899, 2026 WL 891891, at *8 (D. Nev. Mar. 31, 2026).

allege that he filed a proof of claim in accordance with the Plan procedures and nothing in the record nor the Bankruptcy Court's docket suggests he did so.  Accordingly, his claims against Wellpath based on pre-petition conduct will be dismissed.  *See Pew v. Letizio*, No. 24-5981, 2026 WL 838309, at *1 (E.D. Pa. Mar. 26, 2026) ("Because Pew's claim arises from alleged conduct in 2022, it is a preconfirmation claim subject to the confirmed plan and discharge injunction.  Pew therefore may not continue this action against Wellpath.").

The Plan also includes a Third-Party Release that precludes personal injury or wrongful death claims against current and former employees of Wellpath, such as Dr. Letizio, based on pre-petition conduct.  *See* Order Confirming Ch. 11 Plan, *In re Wellpath Holdings*, No. 24-90533 (Bankr. S.D. Tex. May 1, 2025), ECF No. 2596 at Article IX.D.  A claimant who does not want to be precluded from pursuing his claims against Wellpath employees per the Third-Party Release was required to file a timely "Opt-Out" in accordance with the Plan.  *Id.* at Article IX.F; *see also id.* at Article I.A.177-178 (defining "released parties" and "releasing parties"); *see also* General Form of Order Regarding Lift Stay Motions, *In re Wellpath Holdings*, No. 24-90533 (Bankr. S.D. Tex. May 1, 2025), ECF No. 2907, ¶ 6 (extending deadline to July 30, 2025, for incarcerated individuals with potential claims to file an opt out).  Wellpath and Dr. Letizio assert that Lomax did not file the required "opt out" and Lomax neither contradicts the validity of that representation nor raises any arguments challenging the applicability of the Third-Party Release to him.  He has therefore forfeited any such arguments.  *See DLJ Mortg. Cap., Inc. v. Stevens*, 167 F.4th 632, 635 (3d Cir. 2026) (explaining that failure to timely raise an argument or assert a rights is considered a forfeiture).  Accordingly, the Court will dismiss Lomax's claims against Dr. Letizio because they are based on pre-petition conduct occurring in 2023, that is subject to the Release.  *See Davis v. Amour*, No. 23-00593, 2026 WL 820668, at *2 (W.D. Va. Mar. 25,

2026) (observing that, pursuant to the plan, "any claimholder who did not affirmatively opt out of the third-party release is permanently enjoined from pursuing claims against [Wellpath employees] as they would be against Wellpath itself" and that "several courts . . . have dismissed claims against individual Wellpath employees where the plaintiff did not opt out of the third-party release" (citing cases)); *Thomas v. Sorber*, No. 23-907, 2026 WL 753594, at *6 (E.D. Pa. Mar. 17, 2026) ("Because Mr. Thomas has not provided any evidence that he timely opted out of the Third-Party Release, I must conclude that Dr. Bazel has been released and discharged from any claims arising out of the events pleaded in the Complaint.").[12]

However, the bankruptcy proceeding does not affect claims based on any delay in or denial of care occurring after Wellpath filed for bankruptcy.  Indeed, Lomax's Complaint alleges that he still requires surgery for his knees, which have worsened over time, and that the denial of care remains ongoing at least in part due to Wellpath's Doctor Line custom.  *See* DI 1 at 6 ("As a proximate result of Defendants' custom, policy, practice [Lomax's] untreated right knee condition has now spread to [his] left knee, *with both knee conditions remaining untreated* by Defendants." (emphasis added)).  In other words, the Complaint may reasonably be read to seek relief for ongoing conduct post-dating Wellpath's filing for bankruptcy.

Lomax's more recent filings support this allegation.  A medical record from Global Diagnostic Services, which Lomax attached to one of his Responses, indicates he was finally referred for diagnostic imaging on both knees on May 23, 2025, which revealed "[s]evere

---

[12] Any arguments concerning the validity of the third-party release or the adequacy of notice and consent are best directed to the Bankruptcy Court and District Court for the Southern District of Texas.  *See, e.g.*, *Davis*, 2026 WL 820668, at *3 (citing, *inter alia*, *Patterson v. Mahwah Bergen Retail Grp.*, 636 B.R. 641 (E.D. Va. 2022)); *cf. In re Smallhold, Inc.*, 665 B.R. 704, 717-26 (Bankr. D. Del. 2024) (discussing the consent requirement for third-party releases in the wake of *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024)).

multicompartmental joint space narrowing with proliferative spurring . . . with bone-on-bone" in both knees, leading to an "impression" of "advanced osteoarthritis."  DI 21 at 16-17.  A progress note in Lomax's medical file dated June 4, 2025, likewise attached, reports that the results of the imaging were "reviewed with [Lomax]" and that the plan going forward was "to request MD line for orthro c/s approval follow up with medical as needed."  *Id.* at 20.

In the meantime, Lomax alleges that his "knees are shot and causing [him] tremendous pain" and he "has been walking with 'bone-on-bone' erosion for a couple of years now, so [he] is filled with sharp pains, and constant angerDI 34 at 8.  He contends that his

> diagnosed medical conditions remain untreated not as a result of professional judgment but based simply upon i) a sick call custom, policy and "doctor line" requirement at the discretion of unqualified sick call personnel. ii) Monique Savage's false entry or information in the medical record and grievance process; and iii) the defendant's scheme to reduce medical cost involved with providing immediate, adequate and properly needed medical treatment and care of Lomax, and prisoners by reducing the number of off-site medical trips to hospitals and specialty clinics.

DI 21 at 8.  Further, he requests injunctive relief in the form of "immediate, adequate and proper treatment [for his] right and left knees."  DI 1 at 8.  Accordingly, to the extent the Complaint is based on the ongoing denial of care because of delays allegedly caused by the Doctor Line system, his claim may proceed against Wellpath only as to conduct post-dating November 11, 2024.

## V.    CONCLUSION

For the foregoing reasons, the Court will:  (1) deny Defendant Savage's Motion; (2) grant Wellpath's Motion in part because claims based on conduct occurring prior to November 11, 2024 were discharged in bankruptcy, and otherwise deny the Motion as to claims based on post-petition conduct; (2) grant Dr. Letizio's Motion because the claims against him, which are based on acts he took in June of 2023, were released in bankruptcy; and (4) *sua sponte* dismiss any due

20

process claims as well as all claims against Defendant Waters.  The dismissed claims against Wellpath and Dr. Letizio will be dismissed without prejudice to Lomax obtaining any relief that may be available to him through the Bankruptcy Court.[13]  The due process claims and claims against Waters will be dismissed without leave to amend because the Court concludes that amendment of those claims would be futile.  An appropriate Order follows, which directs the remaining Defendants—Savage and Wellpath—to respond to the remainder of the Complaint.

---

[13] The Court expresses no opinion on this matter but leaves open the possibility that such relief may be available.